OMEGA INV. CO. v. WOOLLEY et al.
(COWLEY et al., Interveners).

No. 4509.   Decided May 21, 1928.   (271 P. 797.)

On Motion for Rehearing November 20, 1928.

*Arthur Woolley,* of Ogden, and *H. S. Tanner* and *J. Louis Brown,* both of Salt Lake City, for appellants.

*Wilson & Barnes* and *E. A. Walton,* all of Salt Lake City, for respondent.

BATES, District Judge.

This action was brought to recover 465,701 shares of the capital stock of the Nathaniel Baldwin Incorporated, a corporation hereafter referred to as the Incorporated. The respondents claim that the stock in question belonged to the plaintiff, Omega Investment Company, and that it was transferred to the other defendants by the defendant, the Incorporated, by virtue of fraudulent practices and undue influence exercised by said defendants upon Nathaniel Baldwin, who was the principal stockholder of the plaintiff corporation and of the Incorporated.

It is admitted by the defendants that the stock in question was transferred to them as alleged, but they deny that the transfer was because of fraud or undue influence, and affirmatively allege that the transfer of the stock was supported by a valuable consideration after careful deliberation by Baldwin, who acted in said transaction upon the advice of other disinterested persons.

Pleadings on the part of the plaintiff and Nathaniel Baldwin, as intervener, set out in detail the facts and circumstances constituting the confidential relations, fraudulent practices, and undue influence claimed to have induced the transfer of the stock, but it is unnecessary to recite the allegations in detail in this opinion. The findings of the court are full, and, in general, conform to the allegations of the complaint. Judgment was rendered directing the return of the stock to the plaintiff, and should be sustained, if the proof offered can be said to establish the facts pleaded and found by the court.

The doctrine has been frequently announced by this court that in equity cases, unless we are convinced that the trial court was clearly wrong in his findings, the judgment

must stand. *Hoggan* v. *Price River Irrigation Co.*, 61 Utah 547, 216 P. 238. For several weeks the trial court listened to the witnesses in this case, observed their demeanor, their frankness and candor, or the want of it, and was undoubtedly influenced by the observations so made and the impressions so gained in arriving at a conclusion as to what the findings of fact should be.

The following facts offered in support of, and tending to prove, the allegations of the plaintiff's complaint and the complaint in intervention of Nathaniel Baldwin, are fairly established by the evidence in the record:

Nathaniel Baldwin was, at the time of the trial, about 47 years of age, fairly intelligent, being a mechanical genius, and having spent most of his life along electrical inventive lines. About the year 1914 he invented, and in a small way began the manufacture of, telephonic and radio equipment. His business grew and increased until the year 1922. At that time he was making about 150 sets per day, having a value of several hundred dollars. In 1922 he caused the Nathaniel Baldwin Incorporated to be organized, and conveyed and transferred to it the manufacturing plant, equipment, and other property used by him in connection with the manufacturing business. This was the only property of which the company became the owner of.

Defendants Lorin C. Woolley, Clyde Nielson, John T. Clark and H. S. Tanner had been associated with Baldwin for some time prior to that, and, as a result of their associations and labor with him, he had placed confidence in them, consulted with them, employed them, and depended upon them as advisors and agents in the carrying on and development of his business. To these men he caused to be issued small blocks of stock in the Incorporated, made them directors, and consulted and advised with them relative to the management of his affairs.

Almost immediately after the Incorporated was organized, Baldwin also organized the Omega Investment Company.

He transferred to it the greater portion of his stock in the Incorporated, and issued to Nielson, Clark, Tanner, Lorin C. Woolley, and a few others, small blocks of stock in the plaintiff company. They advised and consulted with Baldwin as to the management of its affairs, and he undoubtedly relied upon, and placed confidence in, their advice and judgment. Nothing was paid by any of these parties for their stock in either of the corporations. The record is clear that they held it subject to the will of Baldwin, and in most cases, if not all, executed options authorizing him to repurchase at half its value at any time he desired.

During the year 1923 financial difficulties developed. A contract had been entered into and assigned to the Baldwin Radio Company out of which litigation had developed, involving a great many thousands of dollars. Baldwin was greatly concerned because of this litigation and other financial troubles. Lorin C. Woolley, a cousin of the defendant, Ernest Woolley, in the early part of 1924, told Baldwin of Ernest Woolley; that Ernest Woolley had great ability as a lawyer, and that he could manage law matters; that he was able to cope with almost any kind of opposition; and that in his way in legal matters he was superior to anybody in the West. Baldwin became convinced that Woolley would be of great assistance to the company, and went to see him. Woolley evinced a great interest in Baldwin's business, spoke of the amount that could be made if it were handled right, expressed a desire to get to sell the goods, and his interest in the litigation pending. From that time on Woolley and Baldwin were in frequent consultation with reference to the Baldwin business. The place of transacting business was transferred to the offices of Ernest Woolley, where Baldwin and the directors met almost daily and consulted with each other and with Ernest Woolley with reference to the business affairs of the Baldwin companies.

In January or February of 1924 Baldwin employed Woolley to secure a settlement of the pending litigation with the

Baldwin Radio Company, paying him therefor the sum of $1,500. At that time, Woolley said he could help materially; that he would be glad to do so, and guaranteed that Baldwin would be satisfied with the results. Baldwin permitted Woolley to proceed to an adjustment of that litigation without consulting with, and without the knowledge of, counsel of recognized ability who were representing Baldwin in court. An agreement of settlement was reached in the month of September, 1924, and the action finally dismissed on the 24th day of December of that year.

In the month of August, meetings between Woolley, the directors, and Baldwin became more frequent. The Baldwin companies were in need of money, and Woolley proffered to secure it in various sums ranging from $20,000 to $50,-000. He was constantly giving Baldwin advice and instructions, and Baldwin relied upon Woolley as an advisor and adjuster. Baldwin's testimony as to his confidence in Woolley is illustrated by the following quotation from the abstract:

"I learned to look upon him as a master mind that could comprehend great things easily, take them all in, understand them, a master mind in matters of business and law. My confidence in Ernest Woolley as master in these matters and also as a good man, which I was led to believe that he was, and an honest man, continued until some time in the spring of 1925. Then doubts began to creep in because of things that happened, and my confidence in him as an honest man failed."

It is fairly apparent from the record that Woolley continued to act as the confidential advisor of Baldwin, at least until the 24th of December, 1925, at which time the proposal for the transfer of the stock in question was made. On that date Woolley proposed to him that he cease acting merely as an advisor and that he be made an equal owner in the business.

On the 24th of September, 1924, Woolley secured from the Incorporated what is known as the infringement contract,

which on its face gave him full power to bring suits upon, and adjust, under such conditions as he desired, all cases of infringements upon Baldwin patents, and to retain 75 per cent of all moneys received in making such adjustments by suit or otherwise. On the 27th of September another agreement, known as the sales agency agreement, was entered into whereby Woolley was given exclusive right to sell all the products manufactured by the Incorporated. The instrument provided that Woolley pay 44 per cent of retail prices when the goods were delivered to him. About the 2d of October, Woolley made demand that all the finished products be turned over to him. He told Baldwin that he would be able to raise the money to meet the pay roll immediately when he got the goods. Baldwin directed the delivery of the goods, valued at $100,000, and Woolley took control, but without the payment of the price as agreed upon, either upon delivery or at all. On the 7th of October Woolley secured a modification of the sales agency agreement providing that payments be made at list price, less trade discount of 60 per cent, 2 per cent 10 days, net 60 days. At that time several thousand dollars were due from the company to employees and others. Payment was being demanded, under threat that, unless payment was made, the business would be thrown into the hands of a receiver. Woolley promised that he would pay within four days, but this he did not do. On the 8th of October, 1924, a receiver was appointed, and took possession of the property of the Incorporated. On November 14th Woolley secured another contract wherein it was provided that the entire plant, equipment, materials on hand and manufactured products should be sold to him for the inventory prices of the receiver. Woolley agreed to pay that amount within 30 days, but did not do so.

The receiver, in making up the inventory, listed it from the viewpoint of what it would turn under forced sale as an insolvent concern. The real estate and machinery was inventoried at $40,000. At the time of the trial, the receiver valued the same property at $124,000, or 70 per cent of the

book value. Instead of disposing of the property at forced sale, the plant was operated by the receiver successfully and profitably, and, as a liquidating concern, he says the value materially increased.

During the latter part of November and the month of December, until just prior to the 24th, Ernest Woolley was in the East, attempting to secure money with which to take the property out of the hands of the receiver and refinance it. On the 24th Woolley told Baldwin he was unable to have the proper influence with people with whom he was trying to raise money because he could not speak with authority, and said that, if he could have an equal interest in the business, and be appointed vice president, he would be in a position where he could say "yes" or "no" instead of being a go-between, and that he would get something done. He proposed that he be made an equal owner in the Baldwin companies. The defendant directors favored giving him the stock, Tanner saying he thought it was the best thing to do under the circumstances; that he knew it was a sacrifice, but he did not believe Ernest would take it under other conditions. The directors told Baldwin they thought it was the only thing to do. They spoke of the great danger the company was in, and said Woolley was the only man who could get it out. Under this continued pressure, Baldwin yielded to the proposition. Baldwin testifies that he was carried by the influence of others to make the move, but consented to it because all the other directors that were present were urgently in favor of it. Baldwin testified the conditons for which the stock was divided was that the business would be successfully handled, debts paid, receivership terminated, and adversaries overcome; that the contracts referred to should be surrendered so that they would stand as if there were no contracts; that Woolley said he would surrender them all.

The contract of September 27th with its modifications and the agreement for the sale of the property dated No-

vember 14th were delivered to John T. Clark, one of the directors, to be held until the termination of the receivership and then delivered to the Incorporated. The contract of September 24th, known as the infringement contract, was not delivered, Woolley insisting that it was not part of the agreement or consideration for the transfer and assignment of the stock, but the court specifically found against him on that point, holding that the contract was included in the agreement, and that Woolley failed to surrender it.

It is insisted by counsel for the defendants, and we think rightly, that this action is in effect a suit by Nathaniel Baldwin against Ernest R. Woolley. The Nathaniel Baldwin Incorporated was organized by Nathaniel Baldwin for the purpose of carrying on his business in a corporate name. He is the only person who contributed to its assets. Some stock was issued by the corporations to a few other persons, but they paid nothing for it, and in all but one or two cases gave Baldwin a right of repurchase for considerably less than its face value. The directors of the company all felt it their duty in the performance of their official duties to consult the will of Nathaniel Baldwin, and did it. Baldwin intentionally retained such control that, if any person did not concede to his wishes, he could remove him and appoint another. No stockholder has appeared in this action, excepting those who are either concededly with Baldwin and acting for his interests, or have associated themselves with Ernest R. Woolley, and who insist that their interests are his interests. The same conditions exist with reference to the plaintiff corporation. It is Baldwin's corporation, organized under his direction for his own benefit. The directors thereof, until the final breach, acted under his direction. They voted according to his wishes. Their stock was held under option to repurchase by Baldwin, and, if they did not act agreeably to his wishes, he held the power to demand their resignation, and did not hesitate to use it.

The Nathaniel Baldwin Sales Company was organized under the direction of Ernest R. Woolley with 10,000 shares

of capital stock, having no par value. Woolley took 1,000 shares, three others one share each, and Royal B. Young 8,997 shares. It was organized three days after the contract known as the sales agreement was entered into by Woolley with Baldwin. On the 11th of October, 1924, only eleven days after the organization, Woolley stated to the directors that he had received no compensation for securing the contract with Nathaniel Baldwin Incorporated, and that large obligations had been incurred, and requested that they assign the contracts to him in consideration of his releasing the company from liability for personal services, organizing a Delaware corporation, assigning the contract to it, and holding the stock as his personal property. The assignment was promptly made by the directors without other consideration, and the Delaware corporation was formed. Woolley insists that he immediately thereafter, in violation of his promise, transferred or had issued to William Hudson the greater part of the stock of the Delaware company, but the preponderance of the evidence is to the effect that Woolley was in absolute control of the defendant Nathaniel Baldwin Sales Company of Delaware.

The corporations are all one-man corporations, and Baldwin and Woolley were undoubtedly doing business with each other personally under corporate screens. It was in effect their business, and this lawsuit is in effect between them personally.

There can be no question but that the trial court was justified in drawing the conclusion that a fiduciary relation existed between Baldwin and Woolley at the time the stock in question in this case was transferred. In fact, no other conclusion can reasonably be drawn. Woolley came into the employ of Baldwin as an agent to settle important litigation that was not finally and completely settled until the day the negotiations for the transfer of the stock began. From the time of Baldwin's acquaintance with him in January of 1924, he constantly manifested an interest

in Baldwin's welfare, permitting his office to become the center of discussions with reference to the Baldwin interests. He proffered and endeavored to secure moneys to overcome the financial necessities, advised and conferred with him, and in every action so conducted himself as to induce Baldwin to believe that Woolley was constantly working for Baldwin's welfare.

"A confidential relation exists when confidence is reposed by one party and a trust accepted by the other, when a confidence has been imposed and betrayed, or when influence has been acquired and abused. It embraces both technical and fiduciary relations and those informal relations where one man trusts in and relies on another." *Dale* v. *Jennings*, 90 Fla. 234, 107 So. 175.

It is true that Baldwin cannot be considered mentally weak. He was at the age of life when men are usually best able to protect themselves, and had had some experience as a business man in the world. But that is not controlling in determining whether a confidential relation exists or whether undue influence is used. The question in all cases is whether influence is acquired and abused or confidence is reposed and betrayed.

"Where there is no coercion amounting to duress, but a transaction is the result of a moral, social, or domestic force exerted upon a party, controlling the free action of his will and preventing any true consent, equity may relieve against the transaction, on the ground of undue influence, even though there may be no invalidity at law. In the vast majority of instances, undue influence naturally has a field to work upon in the condition or circumstances of the person influenced, which render him peculiarly susceptible and yielding,—his dependent or fiduciary relation towards the one exerting the influence, his mental or physical weakness, his pecuniary necessities, his ignorance, lack of advice, and the like. All these circumstances, however, are incidental, and not essential. Where an antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exerted; where there is no such fiduciary relation, the confidence and influence must be proved by satisfactory extrinsic evidence; the rules of equity and the remedies which it bestows are exactly the same in each of these two cases. * * *

"The doctrine of equity concerning undue influence is very broad, and is based upon principles of the highest morality. It reaches every case, and grants relief 'where influence is acquired and abused, or where confidence is reposed and betrayed.' It is especially active and searching in dealing with gifts, but is applied, when necessary, to conveyances, contracts, executory, executed, and wills." 2 Pomeroy, Equity Jurisprudence, § 951.

The confidential relation being shown to exist, the burden devolved upon Woolley to show that, in the making of the transaction, the fullest and fairest explanation and communication was made to Baldwin of every particular in Woolley's breast; that the transaction itself was fair, and the consideration paid therefor adequate, before a court is justified in permitting the transaction to stand.

While equity does not deny the possibility of valid transactions between the two parties, yet because every fiduciary relation implies a condition of superiority held by one of the parties over the other, in every transaction between them by which the superior party obtains a possible benefit, equity raises a presumption against its validity, and casts upon that party the burden of proving affirmatively its compliance with equitable requisites, and of thereby overcoming the presumption. * * *

"Wherever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no such confidential relation had existed. Courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases might be excluded. It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation exists as a fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic, or merely personal." 2 Pomeroy, Equity Jurisprudence, § 956.

We do not think the record in this case shows a compliance with these requirements. That Woolley believed he gained an advantage by the transfer of the stock in question is perhaps best evidenced by the earnestness with which he has endeavored in this litigation to retain the results of the transaction. In fact, his counsel recognize that it was advantageous to Woolley, and attempt to justify on the ground that no confidential relation existed, and that Baldwin cannot complain merely because he was outtraded.

There is evidence in the record to show the value of the property as an insolvent concern on the 8th of October, 1924, but there is nothing to show its condition or value on the 27th of December when the transaction complained of was completed. Neither does the record disclose the value on November 14th when the agreement of sale was entered into. The receiver valued it only as an insolvent concern, without consideration of its value as an operating business, and without consideration of the patent rights which would necessarily enhance the value of the plant. Woolley induced Baldwin to enter into the agreement of sale on the 14th of November on the basis of the inventory prices. And then, on the 27th of December, under his theory of the case, surrendered that agreement and the sales agency agreement, and its modifications, as a consideration, and the only consideration for the transfer of the stock.

The receiver, instead of selling the plant and equipment, operated it so successfully that at the trial of the case in the latter part of 1925 he estimated its value with the patent rights at approximately $1,000,000. To what extent the concern had become solvent, paid its debts, or increased its value, November 14th or December 27th, the record is wholly silent. Whether Woolley had information at that time, that Baldwin did not have, of facts that tended to enhance the value of the property, cannot be told. The burden under the authorities was upon Woolley to show that he made a full and fair disclosure of all facts within his knowledge to

Baldwin and that Baldwin entered into the agreement freely and fully advised.

The rule as applied between attorney and client is well stated by the Supreme Court of California in  *Cooley* v. *Miller & Lux,* 156 Cal. 510, 105 P. 981, as follows:

"The presumption always arises against the validity of a purchase or sale between the client and attorney made during the existence of the relation. The attorney must remove that presumption by showing affirmatively the most perfect good faith, the absence of undue influence, a fair price, knowledge, intention, and freedom of action by the client, and also that he gave his client full information and disinterested advice."

Not only was the burden placed upon Woolley to show a full and fair disclosure of all facts within his knowledge, but it was also his duty to show that the transaction was fair and equitable, and that the consideration paid was adequate.

The rule is well stated in a Utah case, as follows:

"Thus, in transactions between persons occupying such relations, in which the stronger or superior party obtains a benefit or advantage, fraud is presumed, and the burden is cast upon the superior party to show fairness, adequacy, and equity in the transaction." *Peterson* v. *Budge,* 35 Utah 596, 102 P. 211.

In *Feeney* v. *Runyan,* 316 Ill. 246, 147 N. E. 114, the court says:

"The burden was on Williams to show that the transaction was fair and equitable and that the price paid was adequate."

All of the instruments relied on by the defendant as the consideration for the transfer of the stock were executed while the relation of confidence existed between the parties, and are burdened with the presumption that they were executed as a result of undue influence and

fraud without full disclosure of all facts known by Woolley, and without an adequate consideration. The same thing is true with reference to the infringement contract and all other transactions between these parties during the year 1924. No attempt was made to overcome the presumption.

The transfer of the stock on the 27th of December was the culmination of a series of transactions, all of them entered into with a fiduciary, and burdened with a suspicion of fraud and undue influence, to sustain which Woolley was bound to show fairness, full disclosure, and adequate consideration. This he did not do. The effect of these transactions was to assign to Woolley more than one-half of whatever the properties were worth on the 27th of December, 1924, as an established business in control of valuable patent rights and having a heavy demand for the manufactured product, without the contribution of one dollar in money or one dollar's worth of property, either directly or indirectly. In fact, Woolley, during the trial, made no claim of any consideration passing for the transfer of the stock, except the surrender of the purported contracts.

These transactions are not separate and distinct, but are so woven together by the ties of confidence that they must be considered as a connected whole. Each of the purported agreements was more advantageous to Woolley than its predecessor, and each of them as they were executed had the direct effect of more securely tying Baldwin's hands and making it more impossible for him to move independently. Each move gave Woolley a more dominant position, and made Baldwin more dependent on his advisor. The task of raising the money with which to get the business out of the hands of the receivership had been undertaken by Woolley, and he was looked to for this purpose almost exclusively. When he told Baldwin on the 24th that he did not have the proper influence because he could not speak with authority, but that, if he could have half the business and be made vice president, he would put the thing over big, Baldwin was in

his power. He was the victim of a series of circumstances contributed to, if not created by, Woolley. It is true that Baldwin might have secured competent legal advice, and in that way have avoided the pitfalls. But the reason for his not doing so is apparent. His confidence in Woolley was so great that he accepted his advice on legal matters in preference to his regularly employed counsel. A contract entered into under such conditions between persons in a fiduciary relation should be set aside by a court of equity when it appears that the fiduciary has secured a contract advantageous to him.

The defendant urges that Baldwin talked with the directors of the plaintiff company, and they told him they thought that under the conditions it was the best thing to do, although it was a sacrifice. But that cannot save the transaction from the suspicion of fraud. From the beginning they had been associated with Baldwin and Woolley. Some of them recommended that Woolley be induced to give assistance. His influence undoubtedly reached and affected them. They were beneficiaries of the transfer of more than 30,000 shares of the stock, at least to the extent of holding the same in trust for Woolley, and from the day of the transfer have stood solidly with him. They were interested and not disinterested advisors, as equity requires. The rule of law in such cases is well stated in *Hogan* v. *Leeper*, 37 Okl. 655, 133 P. 190, 47 L. R. A. (N. S.) 475, as follows:

"Whenever there exists between parties confidence on the one hand and influence on the other, from whatever cause they may spring, equity requires in all dealings between them the highest degree of good faith on the part of him in whom the confidence is reposed. If a conveyance is executed by the other in his favor, the burden rests upon him to prove that it was not procured by means of such confidence and influence. It is his duty, before accepting the conveyance, to see that the grantor has disinterested advice and full information."

See, also, *In re Spann*, 51 Okl. 309, 152 P. 68.

It is suggested by counsel for the defense in argument that, in addition to the surrender of the contracts and the rights acquired under them, the understanding was that, becoming interested in the business, Woolley would devote his time and efforts to it, particularly in looking after the business and financing matters, and that, under plaintiff's theory of this case, would be an advantage to Baldwin and the Incorporated of importance. Counsel says that Baldwin regarded that as the most important part of the consideration. Counsel's position so taken is squarely contrary to defendant's theory, as set out in his pleadings, but, if it should be looked upon as part of the consideration for the transfer of the stock, it furnishes only an additional reason why the transaction should be set aside. The testimony shows that Woolley was to remove the business from the hands of the receiver. He did not do it. Neither does the record show that he did anything to aid in any way in reaching a solution of the difficulties from the time the stock was transferred to him. There is no question in the writer's mind but that the profuse promises made by Woolley induced Baldwin to think that, if Woolley became a part owner so as to have power to speak with authority, as Woolley told him, he would then be able to secure the money, get the property out of the hands of the receiver, and establish the business on a sound basis. For five months Baldwin waited. Nothing was done by Woolley.

These representations were in harmony with the whole scheme. Woolley promised to pay for the $100,000 worth of the manufactured products at the time of delivery to him, but got them without making the payment, and the undoubted result was that the business went into the hands of the receiver. He said he would raise large sums of money to pay the pressing debts with, but in each instance failed. The agreement of November 14th provided that he should pay for the plant within 30 days, but he did not do it. Then he used these former agreements, all broken and breached by him, as the basis of the stock transfer on the 27th of De-

cember. As additional inducement to Baldwin, he promised that, if the stock were transferred, he would put the thing over big; he would get the business out of the receivership; and that Baldwin would make more out of the half than he could out of the whole. It was a series of broken promises, each one in its turn operating to make Baldwin feel more dependent on Woolley. The final result was that Woolley held the control of the properties and patents subject to the receiver. The receiver was financing and operating the business; the debts were being paid, and the results demonstrate that the potential value of the property was great. Whatever profits were realized, Woolley would share in. If there were losses, he took no risk. Such were the advantages he hoped to gain as the results of his dealings with Baldwin in a fiduciary capacity. These are the advantages his counsel claim for him on the theory that he merely outtraded Baldwin. There was no trade; there was no exchange. Woolley took all for nothing from a person whom he knew had placed implicit confidence in him as a man of integrity, learned in the law, trained in the arts of finance, and loyal.

The following language of the Supreme Court of Washington in *Stone* v. *Moody*, 41 Wash. 680, 84 P. 617, 85 P. 346, 5 L. R. A. (N. S.) 799, is applicable to the facts in this case:

"Where it is to the court perfectly plain that one party has overreached the other and has gained an unjust and undeserved advantage which it would be inequitable and unrighteous to permit him to enforce, we do not believe that a court of equity should hesitate to interfere, even though the victimized parties owe their predicament largely to their own stupidity and carelessness. It is well known that many good people and people of average or greater intelligence are sometimes duped and misled by the skill, cleverness, and artifices of those who are adepts in the matter of deceiving their fellow men; and courts should not throw about schemers of this kind a protection that will tend to encourage the practice of their arts. Such people should not find encouragement in the thought that, by keeping their machinations within the letter of the law, they may find sanction for their practices and reap the reward of their craftiness. To the victim it is of little import whether his property is taken from him by a bold and forcible robbery or by an ingenious and unsuspected de-

ception. The injury to him is the same; and the evil effect of court decisions which permit the wrongdoer to enjoy the fruits of his chicanery is of no small import when viewed" in the light "of public policy."

The judgment should be, and it is affirmed.

THURMAN, C. J., and CHERRY and GIDEON, JJ., concur.

STRAUP, J., being disqualified, did not participate herein.

HANSEN, J. (dissenting).

I am unable to agree with the conclusion reached in the prevailing opinion in this case. To enable the reader to understand the basis of my dissent, it is necessary for me to state the essential facts established by the evidence as I read the record before us.

At the time of the trial of this case, 1926, the defendant Ernest R. Woolley was 43 years of age. He was, and had been, a stockholder and officer in various corporations. He was, and had been, engaged as a promoter of various business enterprises. The intervener, Nathaniel Baldwin, was 47 years of age. He had completed the common and high school courses of study and attended college for a period of 2 years. He was also engaged in school teaching for a time. His college work and his teaching experiences were, for the most part, along the line of the sciences, particularly physics and electrical engineering. He was an inventor. In 1914 he began in a small way to manufacture and sell telephone receivers, which he had invented. His business grew until in June, 1922, he employed about 150 men, manufactured about 150 head sets per day, and his output amounted to between $1,000 and $1,500 per day. In 1922 he organized and incorporated the Nathaniel Baldwin Incorporated. Its articles of incorporation were filed on June 23, 1922. I shall hereinafter follow the suggestion of the prevailing opinion by referring to this corporation as the Incorporated. Bald-

win transferred to the Incorporated, in payment of the issued capital stock, the assets of his business, including the patents which he had theretofore used. Practically all of the capital stock in the Incorporated was issued to Baldwin. He became president and a director of the corporation. Each of the other six incorporators received 1,000 shares of the capital stock. They paid nothing therefor, but gave their respective notes to Baldwin for one-third of the par value of the stock. Baldwin was given an option to repurchase the stock by canceling the notes given for the purchase price. About a week after the Incorporated was organized, the Omega Investment Company was incorporated. Its articles of incorporation were filed on June 30, 1922. In payment of the capital stock of the Omega Investment Company, Baldwin transferred to it his stock in the Incorporated, together with his interest in a contract theretofore entered into between Baldwin and one Livingston, whereby Livingston was to pay a royalty to Baldwin for the privilege of manufacturing products covered by Baldwin's patents. Later Baldwin also transferred to the Omega Investment Company certain mining stocks held by him. Practically all of the capital stock of the Omega Investment Company was issued to Baldwin. Here again each of the other incorporators received shares of the capital stock by giving their notes to Baldwin. The notes and certificates of stock were retained by Baldwin, and he was given the option to repurchase the stock by surrendering the notes which were given as evidence of the purchase price. The options to repurchase the stock in both corporations were taken by Baldwin, so that he could readily get rid of any undesirable stockholder. Prior to the incorporation of the Incorporated and of the Omega, Baldwin conducted and managed the entire business. He sold his products for the most part throughout the United States, but did some business in foreign countries as well. The orders for radios became so large in 1922 that Baldwin was unable to supply the demand. He therefore entered into the contract with William D. Livingston, above

referred to, whereby Livingston was given the right to manufacture the Baldwin products and Baldwin was to receive a royalty upon the products manufactured and sold by Livingston. Livingston assigned his interest in this contract to the Baldwin Radio Company, a corporation.

On November 28, 1922, the Incorporated brought an action against the Baldwin Radio Company for the collection of the sum of $70,000. Of this amount $30,000 was evidenced by two notes, and the remaining $40,000 was a claim of the Incorporated for royalties owing to it by the Baldwin Radio Company. The Baldwin Radio Company answered and counterclaimed against the Incorporated. The counterclaim was based upon alleged breaches of the Baldwin-Livingston contract by the Incorporated. It was claimed by the Baldwin Radio Company that it expended $25,000 in advertising the Baldwin products; that it had advanced to Saul & Co. of Chicago $70,000 for the establishment of its plant in Chicago; that, contrary to the terms of the Baldwin-Livingston contract the Incorporated had reduced the price of radio sets from $14 to $12, and therefore the Baldwin Radio Company could not pay the royalty provided for in the Baldwin-Livingston contract and compete with the Incorporated; that the Incorporated was circulating advertising matter, wherein it was stated that all genuine Baldwin products bore the Baldwin signature; that, by reason of these breaches, the Baldwin Radio Company had been damaged in a sum slightly in excess of $300,000. Baldwin was anxious to have this litigation settled. In the latter part of 1923 an effort was made to effect a settlement of this action by the attorneys for the respective parties. A proposed adjustment was reached whereby the Incorporated was to pay the Baldwin Radio Company $150,000, of which amount $25,000 was to be paid in cash, and the remaining $125,000 was to be paid monthly in an amount equal to 6 per cent of the gross receipts of the Incorporated derived from the sale of its products. The Baldwin Radio Company was to transfer to the Incorporated its plant at Holliday, together with its

equipment and stock of goods, and was to cease the manufacture of the Baldwin products. Each corporation was to release all of its claims against the other. The proposed agreement also contained a provision that a bond should be given to the Incorporated conditioned that H. G. Saul of Chicago would cease the manufacture of the Baldwin products. The officers and stockholders of the Baldwin Radio Company refused to furnish such a bond, and for that reason the negotiations for the settlement of the action terminated. The Incorporated began to have other difficulties in 1923. After the Incorporated had organized, it entered into various contracts for the sale of its products. Among them were the following: One with Henry C. Forester, whereby he was given a sales contract covering a large part of the United States; one with E. D. Hashimoto, covering Asiatic countries; one with the Baldwin International Radio Company, covering Canada and other countries. These contracts and others were entered into for the purpose of selling the output of the Incorporated. Baldwin took an active part in negotiating and drawing these contracts, and was assisted by David Neff, who was in charge of selling the products of the Incorporated. Lorin C. Woolley, one of the impleaded defendants in this action, also rendered some assistance in this work. Many of the financial difficulties of the Incorporated grew out of these sales contracts.

Early in the year 1924 Baldwin met the defendant Ernest R. Woolley. According to Baldwin's testimony, the meeting was arranged at the solicitation of Lorin C. Woolley, who is a cousin of Ernest R. Woolley. Lorin C. Woolley testified that he accompanied Baldwin to the apartments of Ernest R. Woolley, but that he did so at the request of Baldwin. The testimony of Baldwin is also to the effect that, because of his talks with Lorin C. Woolley and others, he became convinced that Ernest R. Woolley was the man he needed because of his knowledge of law as applied to business and of business as applied to law, and also because of his influence with lawyers and judges. Lorin C. Woolley corroborated the

testimony of Baldwin, in that he told Baldwin that Ernest R. Woolley was a man of ability in business matters. Clyde Nielson, one of Baldwin's associates, and a director of both the Incorporated and the Omega company, testified that he informed Baldwin that Ernest R. Woolley had a bad reputation, and that Baldwin replied that he had heard of it, but was not concerned about that, because he (Baldwin) was in the same boat himself. On February 9, 1924, Baldwin employed defendant Ernest R. Woolley to assist him in securing a settlement of the litigation pending between the Incorporated and the Baldwin Radio Company. On that date Woolley was paid $1,500 upon condition that, if he did not secure a satisfactory settlement with the Baldwin Radio Company, the money should be returned to Baldwin. After the payment of the $1,500, Baldwin had frequent conferences with Woolley about the settlement of the litigation pending between the Incorporated and the Baldwin Radio Company. They also discussed other matters connected with the business of the Incorporated relative to a way to secure money with which to refinance the Incorporated. Woolley consulted with the attorneys for the Baldwin Radio Company about the terms that company would accept in settlement of the pending litigation. The trial of the case of the Incorporated against the Baldwin Radio Company came on early in September, 1924. After the trial had proceeded for a few days, a settlement was effected. The Baldwin Radio Company conveyed to the Incorporated its manufacturing plant at Holliday, together with all of its machinery, stock in trade, money advanced to Saul & Co., of Chicago, and other assets. The Baldwin Radio Company agreed that it would forever cease the manufacture of the Baldwin products. Each of the corporations released all of its claims against the other. The Incorporated obligated itself to pay the Baldwin Radio Company the sum of $137,500. The record is not clear as to just when this money was to be paid, but it does appear that no cash payment was to be made at the time of the settlement. The deeds to the property to be conveyed by the Baldwin

Radio Company to the Incorporated were placed in escrow, and the payment of the money to the Baldwin Radio Company by the Incorporated was secured by some of the capital stock of the Incorporated. The contract of settlement was filed in the action in court on September 16, 1924. The action, however, was not formally dismissed until December 24, 1924. The delay in dismissing the action after the settlement was made was due to the fact that the attorneys of record for the Incorporated claimed a lien on the cause of action, and objected to a dismissal of the action until their attorney's fee was paid. The attorneys of record for the Incorporated were not consulted concerning the terms of the settlement, but Baldwin notified them of the settlement immediately after the same was made. It appears that the reason the attorneys of record for the Incorporated were not consulted about the terms of the settlement was because Baldwin had lost confidence in them.

On September 24, 1924, a contract was entered into by and between the Incorporated and Baldwin as first parties and Ernest R. Woolley as second party, whereby Woolley was granted authority at his own expense to prosecute all claims of the Incorporated for the infringement of any and all patents belonging to the Incorporated and Baldwin. For this service Woolley was to receive 75 per cent of all moneys collected, and pay to the Incorporated and Baldwin the remaining 25 per cent. This contract will hereafter be referred to as the infringement contract.

On September 27, 1924, a sales contract was entered into between Baldwin and the Incorporated as first parties, and the Nathaniel Baldwin Sales Company, a corporation of Utah, as the second party. By the terms of this contract the Nathaniel Baldwin Sales Company was constituted the exclusive agent for a period of 10 years to sell and dispose of the first parties' entire output of telephone receivers, loud speakers, and all other radio supplies manufactured by the first parties for sale on the general market. The contract also provided that it should cover all improvements,

additions, changes, patents, and inventions that might be made by the first parties. The Nathaniel Baldwin Sales Company was constituted the agent of Baldwin and the Incorporated for securing patents and trademarks in foreign countries. One-half the cost of securing patents and trademarks was to be borne by the first parties and one-half by the second party. The second party was prohibited from dealing in any radio equipment other than those manufactured by the first parties. The first parties retained the right to fix and change prices on their products, but must give the second party 30 days' notice before making any change in prices. The second party agreed to pay upon delivery for all products at a rate of 44 per cent of the retail prices. The first parties were not obligated to deliver any products until all products theretofore delivered to the second party had been paid for in full. The second party agreed to purchase at least $100,000 worth of the products of the first parties per month. In default of the second party purchasing at least $100,000 worth of the products per month, beginning with October 1, 1924, the first parties had the right to terminate the contract. The contract was made subject to other contracts then existing between the first parties and other sales corporations. Time was made of the essence of the contract. This contract will hereafter be referred to as the sales contract.

Baldwin testified that he went over this contract very carefully before executing the same. At the time this sales contract was executed Nathaniel Baldwin Sales Company of Utah was not incorporated. The articles of incorporation of such company were signed and filed on September 30, 1924. The sales contract was the only property owned by the Nathaniel Baldwin Sales Company upon its incorporation.

During the latter part of September, 1924, Baldwin and the directors of the Incorporated were advised that an aplication had been made for the appointment of a receiver of the Incorporated. On September 30, 1924, Baldwin and Ernest R. Woolley ordered all of the finished products of

the Incorporated then in its factory deposited in the Tyng Warehouse. On October 2 or 3, 1924, approximately $40,000 worth of the finished products of the Incorporated were so deposited in the Tyng Warehouse to the order of the Nathaniel Baldwin Sales Company by Ernest R. Woolley. The warehouse receipts were delivered to the bookkeepper of the Incorporated. In the meantime the semimonthly pay roll of the employees of the Incorporated became due in an amount of about $50,000, and the Incorporated was without funds with which to pay the same. Victor Hegstead, a director and credit man of the Incorporated, testified that, as soon as the finished products were deposited with the Tyng Warehouse, he went to Ernest R. Woolley, and informed him that the employees of the Incorporated were on strike, and that, unless cash was paid at once for the radio equipment deposited in the warehouse, the company would go into the hands of a receiver; that Ernest R. Woolley stated that he would make payment within four days. Hegstead further testified that on October 8, 1924, he again made a demand on Ernest R. Woolley in the presence of Baldwin, Nielson, Lorin C. Woolley, and John T. Clark for the payment of the radio products, and that Woolley laughed at Hegstead. So far as appears, neither Baldwin nor any of the others present at the time Hegstead made the demand made any comment.

On October 6, 1924, the Incorporated executed the following instrument:

"Bill of Sale and Assignment of Lease. For one dollar and other good and valuable consideration we hereby sell, assign, and transfer the warehouse lease and warehouse at 1542 Southwest Avenue, Chicago, Illinois, which property heretofore has been occupied by Nathaniel Baldwin Incorporated, but by this instrument we do not set over and transfer to the Nathaniel Baldwin Sales Company all of our right, title and interest in such lease and premises."

On October 7, 1924, two supplemental agreements were executed by and between the Incorporated as first party

and the Nathaniel Baldwin Sales Company as second party. The first agreement provides that the sales contract of September 27, 1924, is ratified and confirmed. And it is further agreed that, in the event the Incorporated shall at any time be unable to operate its manufacturing plant by reason of strikes, lack of material or man power, or because of fire or the acts of God, or of financial difficulty, then the Nathaniel Baldwin Sales Company is given the sole and exclusive right and license to manufacture articles and appliances sufficient to meet the market demand. If the right to manufacture was exercised by the Nathaniel Baldwin Sales Company, it agreed to pay to the Incorporated the sum of $1.50 as royalty for each $12 head set and royalty on a proportionate basis for any and all other articles manufactured by the Nathaniel Baldwin Sales Company. As soon as the Incorporated was able to resume operations and manufacture sufficient to meet the demands of the Nathaniel Baldwin Sales Company, it agreed to cease the manufacture of the Baldwin products. The other supplemental agreement of October 7, 1924, provides that the sales contract is modified to read as follows:

"Second party shall pay for all products by it received at list price less trade discount of 60 per cent, two per cent ten days, net sixty days."

According to the testimony of Baldwin, this supplemental agreement providing for 60 days and 60 per cent trade discount was entered into for the purpose of preventing the receiver when appointed from taking possession of the output of the Incorporated. Baldwin further testified that Ernest R. Woolley informed him that any contract entered into before the receiver was appointed would be binding on the receiver.

On October 8, 1924, at a meeting held at 9 o'clock a. m., the Incorporated executed the following instrument:

"E. R. Woolley, president. Dear Sir: We hereby assign, transfer and set over to you all goods in course of shipment to Chicago and

all goods on hand at Chicago in warehouse, the same to be accounted to us as used."

On October 8, 1924, the Bankers' Trust Company, a corporation, was appointed receiver of the Incorporated by the district court of Salt Lake county. Under date of October 11, 1924, the Nathaniel Baldwin Sales Company of Utah assigned to Ernest R. Woolley the sales contract. On October 14, 1924, the Nathaniel Baldwin Sales Company of Delaware was incorporated, and the sales contract was assigned to it by Ernest R. Woolley. On October 21, 1924, the Incorporated, by Nathaniel Baldwin, president, John F. Clark, vice president, Lorin C. Woolley, H. S. Tanner, and Clyde Nielson, directors, wrote a letter to one of their attorneys directing him to insist that the sales contract and its supplements, be recognized by the receiver, and that this contract was entered into in good faith, and not with any design or intent to defraud the creditors of the Incorporated. It should be observed that the receiver of the Incorporated never recognized any binding effect upon it of the sales contract, but, on the contrary, insisted that the receiver of the Incorporated was entitled to all of the products delivered by the Incorporated to Nathaniel Baldwin Sales Company under the sales contract and the supplements thereto. The radio equipment which was stored in the Tyng Warehouse was shipped to Chicago in the name of the Nathaniel Baldwin Sales Company. No money was paid to the Incorporated or the receiver on account of this equipment. It appears that the expenses of storage and drayage to the cars of the equipment were paid by Ernest R. Woolley in the sum of $700. Woolley also paid Baldwin $472. Soon after this radio equipment arrived in Chicago, it and other property theretofore stored in Chicago by the Incorporated was attached by the receiver of the Incorporated in an action wherein the receiver was plaintiff and the Incorporated and Nathaniel Baldwin Sales Company of Utah were defendants. The Incorporated and the Nathaniel Baldwin Sales Company resisted the action upon the ground that the property belonged

to the Nathaniel Baldwin Sales Company. The litigation resulted in the receiver securing all of the property involved in that controversy.

During the late summer and fall of 1924 Baldwin and Ernest R. Woolley held frequent conferences in connection with their efforts to raise money with which to meet the obligations of the Incorporated. They also consulted with the other directors of the Incorporated. After the appointment of the receiver, the directors' meetings were usually held in the office of Ernest R. Woolley. Baldwin, H. S. Tanner, and Ernest R. Woolley attempted to secure money with which to get the Incorporated out of its financial difficulty, but were unsuccessful in their efforts. Baldwin testified that in one of these conversations Woolley stated that he would mortgage his property for $40,000 and lend the money to the Incorporated, and that, at another time, Woolley stated that he held some sugar company bonds which he expected to sell, and, if he could sell the same, he would lend the Incorporated $50,000, and that later Woolley stated that he was unable to consummate either of these deals. In the latter part of August or the forepart of September, 1924, H. S. Tanner arranged for a loan of $100,000 for the Incorporated. Baldwin refused to take the loan because one La Fount, who arranged for the loan, wanted a commission of 2 per cent for his services, and Baldwin stated he could get the money for a commission of one per cent.

As no satisfactory loan could be secured in Utah, Ernest R. Woolley went East in November, "about Thanksgiving time," to attempt to secure money to get the Incorporated out of the hands of the receiver. Before Woolley departed for the East, and on November 14, 1924, a contract was entered into between Ernest R. Woolley and the Incorporated, which provides in substance as follows: The Incorporated agreed to sell, and Woolley agreed to buy, the manufacturing plant of the Incorporated at the inventory price of the receiver, also all materials on hand at the inventory price of the

receiver, but not less than the cost of the same as shown by the invoices on file; also all manufactured products on hand at the retail list price of the same, less 60 per cent. Woolley was granted the exclusive license to manufacture and sell all of the radio units, phones, loud speakers, and parts thereof, under patents held by the Incorporated and improvements applied for such patents. The payment for the plant, machinery, equipment, supplies, and manufactured products was agreed to be made within 30 days from the date of the contract. Woolley further agreed to pay to the Incorporated 5 per cent of the retail sale prices of all units, phones, and loud speakers manufactured by him during the life of the contract, and to make payments on the 10th day of each month for the output and sales of the preceding month. Woolley further guaranteed that the 5 per cent royalty provided for in the contract should equal at least $60,000 annually, and that the minimum monthly royalty payment should be $5,000. If any minimum monthly payment was not paid within 60 days after the same was payable, the Incorporated had the option to cancel the license and right of Woolley to manufacture and sell the units, phones, and loud speakers described in the contract. On November 15th a supplemental agreement was entered into whereby the contract of November 14th was amended so that 25 cents should be paid for each unit manufactured by Woolley instead of 5 per cent of the retail selling price, as provided in the original contract. The evidence shows without conflict that the contract of November 14, 1924, together with the amendment thereof under date of November 15th, was entered into for the purpose of enabling Woolley to sell such contract while in the East, in case he could secure a purchaser of the same. So far as appears, no money was ever paid to the Incorporated under this contract, and the Incorporated never tendered any conveyance as provided for in the contract.

Ernest R. Woolley remained in the East from the latter part of November until December 22, 1924. Upon his re-

turn to Utah, he reported to the directors of the Incorporated that he had secured $250,000 in Chicago, which was placed in a bank for the purpose of taking over warehouse receipts of the Incorporated, and that the money would be turned over as soon as the warehouse receipts were delivered to the order of the bank. In that way it was proposed to relieve the Incorporated from the receivership. The matter of refinancing the Incorporated was taken up with a Mr. Hardy, an officer of the receiver corporation, who refused to entertain the proposition, and stated that the receivership must take its course.

On December 24, 1924, Ernest R. Woolley, Baldwin, Clyde Nielson, John T. Clark, and H. S. Tanner met in the office of Ernest R. Woolley. At that meeting negotiations began between Baldwin and Ernest R. Woolley, which negotiations later resulted in the cancellation of the sales contract and the transfer of the stock involved in this suit. There is some conflict in the version given by Baldwin and that given by Clyde Nielson, John T. Clark, and H. S. Tanner as to the negotiations had and agreement finally reached in that transaction. According to Baldwin's testimony, Woolley stated to Baldwin that, in order to be successful in his (Woolley's) efforts to refinance the Incorporated, he must be in a position to say "yes" or "no" to any proposition that might be put up to him while negotiating for money; that a proposition was made by either Baldwin or Woolley whereby Woolley was to receive an amount of stock in the Incorporated equal to that retained by Baldwin in exchange for the cancellation and surrender of the sales contract, and also the surrender for cancellation of the infringement contract. Tanner, Clark, and Nielson testified that all of the negotiations had between Baldwin and Woolley were upon the basis of Woolley receiving 51 per cent or a control of the issued capital stock of the Incorporated, and that nothing was said about the surrender of the infringement contract.

Whatever may be the fact as to what was said at the meeting of December 24, 1924, it is quite evident that Baldwin

was not pleased with the proposition that was submitted by Ernest R. Woolley. Baldwin, according to his testimony, was struck with the "monumental greed" of Woolley in asking for one-half of his (Baldwin's) business. No agreement was reached on December 24, 1924. Baldwin remained home on the day following, which was Christmas. On December 26th Baldwin again went to the office of Ernest R. Woolley, and then made Woolley a proposition whereby Woolley should receive an equal amount of stock in the Incorporated with Baldwin for the surrender of the contracts; that Baldwin would regard Woolley's ability as a financier and legal adviser equal to his (Baldwin's) ability as an inventor so far as former inventions were concerned, but not as to future inventions; that Woolley should pay for his stock an amount equal to one-half of the value of the assets of the Incorporated at that time; that Woolley should attend to the business of the Incorporated, and Baldwin should devote his time to the manufacturing end of the business. To this offer Woolley repied, "Oh, you want me to pay for my stock?" Baldwin further testified that Woolley refused to accept the proposition made to him by Baldwin, and that Woolley would not make any proposition other than that originally offered. Baldwin further testified that he went home on the night of December 26th, and "slept" on the proposition. On December 27th a directors' meeting of the Omega Investment Company was called, and the following directors of that company met in the office of Ernest R. Woolley: Nathaniel Baldwin, John T. Clark, H. S. Tanner, and Clyde Nielson. At this meeting Baldwin went over his proposed deal with Ernest R. Woolley. Some of the directors stated that they did not believe a better deal could be secured from Woolley than that offered by him. All of the directors present, Clark, Nielson, and Tanner, stated that in their opinion the offer made by Woolley should be accepted. As a result of the negotiations which were carried on during December 24th, 26th, and 27th, the following instrument was executed by Baldwin and Woolley:

"It is agreed the 919,840 shares of Incorporated to be divided as follows:

10,840 to remain as issued to directors.

465,701 to be issued to Woolley as follows:

$\left\{\begin{array}{ll} 9,000 & \text{Tanner} \\ 9,000 & \text{Clark} \\ 4,402 & \text{L. Woolley} \end{array}\right.$

476,541                                      8,879 Nielson
200,000 Treas.
                                             ————————
                                             31,281
676,541
443,299                E. R. Woolley 434,420

1,119,840 Total Issue                        465,701 shares
          (Osguthorpe from Baldwin)            8,879
                                             434,420
                       Baldwin                10,840

                                             919,840
                                                 Total Issue.

                                  "[Signed]  Nathaniel Baldwin.
                                  "E. R. Woolley.
"J. T. C. Dec. 26————."

On December 27, 1924, Ernest R. Woolley executed the following instrument:

"In consideration of one ($1.00) dollar and 465,701 shares of the capital stock of Nathaniel Baldwin Incorporated, this day paid and delivered to the undersigned, the undersigned hereby sells, assigns, transfers and sets over unto Nathaniel Baldwin and Nathaniel Baldwin Incorporated, respectively, all of the right, title, claim and interest of the undersigned of, in and to that certain agreement dated September 27th, 1924, as amended and modified on October 7th, 1924, between Nathaniel Baldwin and Nathaniel Baldwin Incorporated, on the one hand and Nathaniel Baldwin Sales Company, a corporation, on the other hand; it being the intention of this instrument to re-assign to said respective parties whatever was by each respectively conferred upon the undersigned under said agreement so modified as aforesaid. Nathaniel Baldwin Sales Co. of Utah, by [Signed] Ernest R. Woolley, President. Nathaniel Baldwin Sales Co. of Delaware, by [Signed] Ernest R. Woolley, President. [Signed] Ernest R. Woolley.
"Dated December 27th, 1924."

The foregoing instrument was delivered to impleaded defendant John T. Clark, who later delivered it to impleaded defendant H. S. Tanner. At the same time that Woolley executed and delivered the foregoing instrument a certificate for 506,000 shares of the capital stock of the Incorporated belonging to the Omega Investment Company was canceled and certificates aggregating the same amount were issued and delivered as follows:

No. 36, to Nathaniel Baldwin Sales Company
    of Delaware and E. R. Woolley .............. 434,420 shares
No. 37, to Lorin C. Woolley .......................... 4,402 shares
No. 38, to Delbert Osguthorpe ....................... 8,879 shares
No. 39, to Clyde Nielson ............................ 8,879 shares
No. 40, to H. S. Tanner ............................. 9,000 shares
No. 41, to John T. Clark ............................ 9,000 shares
No. 42, to Omega Investment Company .............. 31,420 shares

These certificates were signed by Nathaniel Baldwin, president, and H. S. Tanner, secretary of the incorporated.

Baldwin admits that the various certificates were issued and signed by him, but testified that during the negotiations he was "like a tumble weed in a wind," and that he entered into the contract for the transfer of the stock because of the fact that Clark, Nielson, and Tanner advised the same. Baldwin further testified that, when he transferred the stock to John T. Clark, Lorin C. Woolley, Clyde Nielson, and H. S. Tanner, it was not so transferred upon an agreement that these persons should transfer the same to Ernest R. Woolley. Baldwin also testified that the infringement contract was to have been canceled and surrendered by Woolley as a part of the consideration for the stock issued to Ernest R. Woolley on December 27, 1924. Clark, Nielson, and Tanner all admit that they advised Baldwin to enter into the contract with Woolley, and they further testified that they did so because they believed it was the best thing to do. The evidence of Clark, Tanner, Nielson, and one R. G. Worsley, a certified public accountant, who was present during a part of the time

the negotiations were carried on which resulted in the agreement of December 27, 1924, is all to the effect that Baldwin did all of the negotiating with Ernest R. Woolley; that Baldwin called the meeting of the directors of the Omega Investment Company that authorized the transfer of the stock to Woolley in consideration of the cancellation of the sales contract; that the infringement contract was not discussed in the negotiations, and was not included in the final agreement; that Baldwin fully understood that the certificates of stock that were issued to Clark, Lorin C. Woolley, Clyde Nielson, and H. S. Tanner should be transferred to Woolley, and the stock issued to Delbert Osguthorpe should be transferred to Baldwin; that Baldwin was normal during these negotiations, and was not urged to enter into the arrangement with Ernest R. Woolley.

All of the documentary evidence shows that the contract entered into on the 27th day of December, 1924, is as contended by the defendants in this action. As I read the record, the evidence is conclusive that Baldwin entered into the arrangement testified to by the impleaded defendant, and not such an agreement as is contended for by Baldwin. The evidence shows without conflict that the stock which was to be issued to Clark, Lorin C. Woolley, Clyde Nielson, H. S. Tanner, and Delbert Osguthorpe on December 27, 1924, was so issued to make it appear from the record of the Incorporated that each officer was a substantial stockholder of such corporation in the amount of 10,000 shares each. Immediately after the stock certificates were issued, Clark, Nielson, and H. S. Tanner indorsed their certificates, and delivered them to Ernest R. Woolley. Osguthorpe indorsed and delivered his certificate to Baldwin. Lorin C. Woolley indorsed and delivered his certificate to Ernest R. Woolley when he returned from the East, which was about January 15, 1925. None of these certificates were surrendered to the Incorporated, nor at the time of the trial had new certificates been issued in lieu thereof. Neither Clark, Tanner, Nielson, Lorin C. Woolley, nor Osguthorpe ever claimed any

ownership in the stock issued to them on December 27, 1924. As soon as the certificates of stock were issued to Ernest R. Woolley, he was made a director and vice president of the Incorporated. Baldwin continued to be a director and president of the Incorporated. The evidence is all to the effect that, at the time the stock in the Incorporated was issued to Ernest R. Woolley, it was agreed that Woolley should look after the refinancing and the business of the Incorporated. Baldwin testified that Woolley's agreement to get the Incorporated out of the hands of the receiver was the principal consideration for the transfer of the stock in that corporation.

Baldwin and all of the defendants herein remained on friendly terms until this suit was begun on May 26, 1925. Baldwin did not demand the return of the stock which was issued to the defendants, for the reason, as he testified, he did not believe it would do any good. Baldwin did demand the return to him of the sales contract. Clark refused to deliver it to him until he consulted Ernest R. Woolley. Ernest R. Woolley told Clark that the contract should be delivered to H. S. Tanner, the secretary, and it was delivered to, and held by, H. S. Tanner until the commencement of this action. On the day after this suit was begun, a meeting of the directors of the Omega Investment Company was called. Baldwin was notified, but did not attend the meeting. John T. Clark, a director and vice president, H. S. Tanner, director and secretary, Lorin C. Woolley, Clyde Nielson, and Edward R. Bateman attended the meeting. At this meeting of the board of directors of the Omega Investment Company, a resolution was passed, which resolution in substance provides that the action of Nathaniel Baldwin, president of the Omega Investment Company, in instituting suit against Ernest R. Woolley, the Nathaniel Baldwin Sales Company of Delaware, and the Nathaniel Baldwin Incorporated, is and was without the vote or consent of the board of directors of the Omega Investment Company and without authority; that the stock in the Incorporated was transferred and de-

livered to Ernest R. Woolley at the special instance and request of Nathaniel Baldwin, and without any false pretenses or fraudulent practices; that Nathaniel Baldwin, as owner of the majority of the outstanding stock of the Omega Investment Company, solicited and requested the directors of the Omega Investment Company to vote and authorize the transfer of the stock of the Incorporated to Ernest R. Woolley, and that the directors of the Omega Investment Company believed it to be for the best interests of the Omega Investment Company to authorize such transfer of stock to Ernest R. Woolley. The transfer of the stock to Ernest R. Woolley was ratified and confirmed, and the action of the Omega Investment Company against Ernest R. Woolley and others was ordered dismissed with prejudice. A certified copy of the resolution was filed with the clerk of the district court of Salt Lake county in this case. Thereafter proceedings were had whereby Nathaniel Baldwin filed a complaint in intervention, as did also M. F. Cowley, who claimed to be a stockholder of the Omega Investment Company. John T. Clark, H. S. Tanner, Lorin C. Woolley, and Clyde Nielson were impleaded as defendants.

As far as appears, Ernest R. Woolley did nothing to refinance the Incorporated or towards getting it out of the hands of the receiver after he received the stock on December 27, 1924. It is not made to appear that Ernest R. Woolley ever did anything under the infringement contract, except that he did take the matter up with an officer of the receiver of the Incorporated. The officer of the receiver of the Incorporated seems to have made claim to all damages that may have resulted to the Incorporated because of the infringement of its patents without regard to the contract with Woolley.

The receiver did nothing by way of prosecuting any claim for the infringement of the patents of the Incorporated.

According to Percival William Dyer, the treasurer of the receiver corporation, the assets of the Incorporated on Octo-

ber 8, 1924, exclusive of the patents owned by it, were as follows:

| | |
|---|---:|
| Cash | $ 10,291.21 |
| Notes and accounts receivable | 95,000.00 |
| Stocks and bonds | 1,500.00 |
| Inventory | 54,487.86 |
| Raw materials, materials in process of manufacture and supplies | 57,000.00 |
| Fixed assets consisting of real estate, buildings, machinery, etc. | 40,000.00 |
| Making a total of | $258,279.07 |

The receiver did not include in the assets of the Incorporated the property situated in Chicago, because, at the time the inventory was made up, the Nathaniel Baldwin Sales Company claimed this property. The property in Chicago amounted to between $100,000 and $120,000.

Baldwin placed the value of the property of the Incorporated at the time the receiver was appointed as follows:

| | |
|---|---:|
| Factory erected in 1923 at a cost of $70,000.00, valued at | $ 70,000.00 |
| Factory acquired in settlement with Baldwin Radio Company, valued at | 70,000.00 |
| Tools and machinery used in factory | 80,000.00 |
| Material on hand for manufacturing | 200,000.00 |
| Manufactured products in Chicago | 100,000.00 |
| Total | $520,000.00 |

The claims filed with the receiver amounted to $747,113.99. Of this amount $233,761.58 was disallowed by the receiver. It is not made to appear whether or not any actions were brought to collect these claims. About $50,000 of claims were still in dispute at the time of the trial. At the time of the trial on March 12, 1926, the receiver had paid $178,-528.01 of the indebtedness of the Incorporated, and had on hand approximately $77,500. Dyer further testified that,

upon the basis of the profits realized during the time the Incorporated had been in the hands of the receiver, the patents owned by the Incorporated were worth about $1,000,000. Baldwin also placed the value of these patents at $1,000,000, but did not state the basis of such valuation.

Upon substantially these facts the plaintiff Omega Investment Company and the intervener Nathaniel Baldwin seek to have the transfer of the stock to Woolley and the Nathaniel Baldwin Sales Company of Delaware as well as the stock transferred to Tanner, Clark, Nielson, and Lorin C. Woolley annulled and set aside, and the stock returned to the Omega Investment Company. The contentions of the plaintiff and intervener are these: (1) That the directors of the Omega Investment Company were without authority to authorize the transfer of the stock; (2) that the transfer of the stock was without consideration; and (3) that the transfer of the stock was secured through fraud and undue influence.

This is a suit in equity. As such, our state Constitution casts upon the members of this court the duty and responsibility of determining both questions of law and of fact. In weighing conflicting evidence of witnesses who appear before the trial court, proper consideration should be given to the fact that the trial court has a distinct advantage that we do not have. The trial court sees and hears the witnesses, and from their demeanor is better able to give proper weight to their evidence than is a reviewing court. It is because of the superior opportunity of the trial court in such respect that appellate courts are reluctant in reversing trial courts upon findings of fact. In equity cases, the parties litigant have the same right to the judgment of the members of this court upon questions of fact as upon questions of law. When the ultimate facts must the found from inferences to be drawn from undisputed evidence, the trial court has no better opportunity to determine the facts than does an appellate court. When the reason for the rule indulging the presumption that the findings of fact of the trial court are correct, is not pres-

ent, the rule itself has no application. This court has so held. *Campbell* v. *Gowans*, 35 Utah 268, 100 P. 397, 23 L. R. A. (N. S.) 414, 19 Ann. Cas. 660; *Beatty* v. *Shelly*, 42 Utah 592, 132 P. 1160; *Holm* v. *Holm*, 44 Utah 242, 139 P. 937; *Savings Bank* v. *Fox*, 44 Utah 325, 140 P. 660; *Little* v. *Stringfellow*, 46 Utah 576, 151 P. 347; *Mayer* v. *Flynn*, 46 Utah 598, 150 P. 962; *Lake Shore Duck Club* v. *Lake View Duck Club*, 50 Utah 76, 166 P. 309, L. R. A. 1918B, 620; *Fensternmaker* v. *Jorgensen et al.*, 53 Utah 325, 178 P. 760; *Steed* v. *Steed*, 54 Utah 244, 181 P. 445.

In the instant case, the evidence is remarkably free from conflict upon the material issues. As I have already indicated Baldwin testified that he was like a "tumble weed in a wind" when he agreed to the transfer of the stock; that Woolley agreed to surrender the infringement contract; and that it was not agreed that the stock made out to Tanner, Nielson, Lorin C. Woolley, and Clark should go to Ernest R. Woolley. The testimony of the other persons present, the documentary evidence, and the circumstances make so strongly against Baldwin upon these claims that I am of the opinion that they must be found against Baldwin. There are no other substantial conflicts in the evidence. Many of the ultimate material facts in this suit must be found by inferences drawn from the uncontradicted evidence.

I agree with the conclusion reached in the prevailing opinion that the evidence in this case shows that the parties in interest in this litigation are Baldwin and Ernest R. Woolley, and that they were merely doing business under corporate names. While M. F. Cowley was permitted to intervene in this suit, the evidence shows that he did not claim ownership of any stock in the Omega Investment Company. J. S. Broadbent testified that M. F. Cowley informed him in August, 1924, that he (Cowley) had no interest in the Omega Investment Company further than to serve Baldwin's purposes. The evidence is all to the effect that Baldwin conducted both the Incorporated and the Omega Investment

Company as the sole owner thereof. Under such circumstances, the separate colorable entity of the Omega should be disregarded and the case disposed of according to the rights of the real parties in interest. *Western Sec. Co.* v. *Spiro*, 62 Utah 623, 221 Pac. 856. The fact, therefore, that some of the directors of the Omega Investment Company may not have received notice of the meeting held on December 27, 1924, when the stock in controversy was, by resolution of the board of directors of the Omega Investment Company, directed to be issued to Ernest R. Woolley and others, cannot be taken advantage of by Baldwin. Neither can Baldwin rely upon the provision of the articles of incorporation of the Omega Investment Company wherein it is provided that "neither the board of directors nor any officer of this company shall have power to assign, sell, alienate, or encumber the property * * * of this company * * * without specific authority given by the stockholders." Baldwin, being the sole stockholder of the Omega Investment Company, cannot be heard to say that he as a stockholder did not give his consent for him to act as a director and president of the company in disposing of his property.

As to the claim of Baldwin and the Omega Investment Company that the transfer of the stock to Ernest R. Woolley was without consideration, there are two answers: First, a consideration was given for the stock; and, second a consideration is not necessary to support an executed agreement. The evidence is all to the effect that Ernest R. Woolley promised and agreed to devote his time to the business of the Incorporated. Baldwin testified that such promise was the principal consideration for the transfer of the stock. That such a promise is sufficient to support a contract is elementary. Ernest R. Woolley and the Nathaniel Baldwin Sales Company surrendered and canceled the sales contract. The contention is made that the physical custody of this contract was not delivered to Baldwin, but to Clark and then to Tanner. I am unable to conceive what difference it could possibly make whether the actual custody of this contract

was with Clark or Tanner. When the contract was canceled, its legal effect was gone, no matter by whom it was held. It is further contended that the sales contract was breached by the Nathaniel Baldwin Sales Company by reason of its failure to pay for the radio equipment delivered to it early in October, 1924, and that therefore all rights under the sales contract were forfeited. To say the least, it is very doubtful if the Nathaniel Baldwin Sales Company ever breached its sales contract with the Incorporated. The evidence is by no means clear that the radio equipment which was deposited in the Tyng Warehouse on October 3 or 4 was ever delivered, or delivery tendered, to the Nathaniel Baldwin Sales Company prior to October 7, 1924, when the supplemental agreement was entered into granting the sales company 60 days time after delivery in which to pay for the goods delivered. It is made to appear that the warehouse receipts were issued in the name of Nathaniel Baldwin Sales Company and delivered to the bookkeeper of the Incorporated. The evidence does not show when these warehouse receipts were delivered to Woolley. It does appear that Baldwin insisted that the Nathaniel Baldwin Sales Company was entitled to these goods even after the action was brought by the receiver in the courts of Illinois for the possession of this property. It also appears that the receiver of the Incorporated secured all of this property. If the Incorporated was unable to pass title to this property to the Nathaniel Baldwin Sales Company, it is difficult to see upon what theory the Nathaniel Baldwin Sales Company was obliged to pay for the same. But, at any event, if Baldwin and the Omega Investment Company received all that they were to receive under the arrangement had on December 27, 1924, they cannot revoke an executed agreement on the sole ground that they received no consideration. 1 Page, Law of Contracts, § 540, p. 906.

Respondents also claim that the stock in question was transferred by fraud and undue influence practiced upon Baldwin, and that a fiduciary relation existed between Baldwin and Ernest R. Woolley, John T. Clark, H. S. Tanner,

Clyde Nielson, and Lorin C. Woolley. The impleaded defendant Clyde Nielson entered the employ of Baldwin in either 1916 or 1917. He first worked as a tuner of receivers, then became a salesman, and, at the time of the transfer of the stock involved in this controversy, was a director of the Omega Investment Company. John T. Clark had been acquainted with Baldwin for about 20 or 25 years prior to December 27, 1924. For a time their associations were mostly of a religious nature. Clark was engaged in writing some religious works. Baldwin assisted him in that work, and advanced Clark some money to carry on the work. Clark became associated with Baldwin in a business way at the time of the organization of the Omega Investment Company. Clark was made a director of that company at the time it was incorporated, and continued as a director up to the time of the trial of this case. Lorin C. Woolley became associated in business with Baldwin at the time of the organization of the Incorporated 1922. He was made a director of the Incorporated at the time of its incorporation. For a time Lorin C. Woolley was in charge of the employment department of the Incorporated. Later he was transferred to the sales department. At the time of the transactions involved in this controversy he was a director of the Omega Investment Company. Baldwin became acquainted with H. S. Tanner about 1923 when Tanner was employed to attend to some legal matters in connection with a mining company in which Baldwin was interested. Early in the summer of 1924 Tanner was regularly employed by Baldwin as his attorney. Tanner became secretary of the Incorporated and the assistant secretary and a director of the Omega Investment Company, which offices he held on December 27, 1924. Tanner, Clark, Nielson, and Lorin C. Woolley, while nominally directors of the Omega Investment Company, were, in fact, the agents of Baldwin. They were owners of stock in the company in name only. Baldwin held their respective certificates of stock to secure their notes. Baldwin also held an option to purchase their stock, and he could exercise his op-

tion to purchase the stock held by the directors by merely canceling and returning the notes given for the purchase price. These directors were thus acting for Baldwin so that he could do business as a corporation. Under this state of facts it would seem that a fiduciary relation existed as a matter of law between Baldwin and the impleaded defendants Clark, Tanner, Nielson, and Lorin C. Woolley. An entirely different situation is presented when the relation between Baldwin and Ernest R. Woolley is considered. During the time Ernest R. Woolley was engaged in assisting Baldwin in securing a settlement of the litigation between the Incorporated and the Baldwin Radio Company, undoubtedly a fiduciary relation existed as a matter of law between Ernest R. Woolley and Baldwin with respect to the settlement of that litigation. The action between the Incorporated and the Baldwin Radio Company was settled on September 16, 1924. Neither party to this action contends to the contrary. After that date, the attorneys of record for the Incorporated objected to a dismissal of that action upon the sole ground that they had not been paid their fee. There is no evidence whatsoever that Ernest R. Woolley was employed to settle the controversy between the Incorporated and its attorneys. After an agency has been fully terminated, the agent, as a general rule, is as free to deal with his former principal as he would have been if the relation of principal and agent had not existed, so long as the agent does not take advantage of his former employment. 2 C. J. § 368, p. 714.

After the settlement of the litigation between the Incorporated and the Baldwin Radio Company, Baldwin and Woolley dealt with each other at arms' length. Such was their relation in entering into the infringement contract of September 24, 1924, the sales contract of September 27, 1924, together with the amendments thereto, and the contract whereby Woolley agreed to buy the property of the Incorporated. Nowhere is it claimed that Baldwin ever agreed to pay Ernest R. Woolley anything for attending to the

financial interests of the Incorporated or the Omega, except with respect to the settlement of the litigation between the Incorporated and the Baldwin Radio Company. When Woolley went East, he did so at his own expense. I am unable to find anything in the record that justifies the conclusion that Ernest R. Woolley was the agent of the Incorporated, the Omega Investment Company, or Baldwin, after the settlement of the litigation between the Incorporated and the Baldwin Radio Company. There is abundant evidence that Woolley frequently advised and consulted with Baldwin after the settlement of the action. Indeed, after Woolley acquired the infringement contract, and particularly the sales contract, it was to be expected that Woolley would be vitally interested in the financial difficulties of the Incorporated. Woolley could not make anything out of his sales contract, unless he could secure the Baldwin products to sell. Baldwin and Woolley, therefore, had a common interest, namely, that of keeping 'the Incorporated manufacturing the Baldwin products. I have been unable to find any authorities, and none have been cited, holding that such a common interest creates a fiduciary relation as a matter of law.

It is, however, contended that the evidence in this case shows that a fiduciary relation existed between Baldwin and Ernest R. Woolley as a fact, in that Baldwin reposed confidence in Ernest R. Woolley, resulting in Woolley exercising an undue influence over Baldwin. It is readily conceded that "the doctrine of equity concerning undue influence is very broad and is based upon principles of the highest morality. It reaches every case and grants relief where influence is acquired and abused, or where confidence is reposed and betrayed." Likewise, the law is well established that "courts of equity have carefully refrained from defining the particular instances of fiduciary relations in such a manner that other and perhaps new cases may be excluded." In order to establish a fiduciary relation as a fact, however, it must appear that the confidence is reposed on one side and resulting superiority on the other. 2 Pomeroy, Eq. Jur. § 956.

"Mere confidence in one person by another is not sufficient alone to constitute a fiduciary relationship. The confidence must be reposed by one under such circumstances as to create a corresponding duty, either legal or moral, upon the part of the other to observe the confidence, and it must result in a situation where as a matter of fact there is superior influence on one side and dependence on the other." *Newell* v. *Halloran* (Utah) 250 P. 986.

The confidence necessary to form the basis of a fiduciary relation in fact must be such that one relies upon the belief that the person trusted will not knowingly take any advantage to the injury of the one so confiding. Baldwin repeatedly testified that he had confidence in the ability and integrity of Woolley. Doubtless in practically every contract founded upon the consideration of a mere promise to perform at some future time the person accepting such a promise has a belief that the one making the promise is honest and able to perform as agreed. If persons about to enter into a contract do not have such confidence, doubtless they will refrain from assuming any contractual obligations, unless the contract is executed forthwith or security given to assure its performance. Evidently the confidence that enters into the establishment of a fiduciary relation in fact is not a mere conviction or assurance that a person is honest or has ability. As already indicated, it is quite apparent that, after the sales contract was entered into, Woolley had a personal interest in the success of the Incorporated. If Baldwin did not manufacture any products, Woolley could not expect to make any money out of the sales contract. With this state of facts, I cannot understand how Baldwin could be led to believe that Woolley's primary concern was to protect the interests of Baldwin. Any doubt as to the nature of Baldwin's attitude of mind towards Woolley is made clear by the evidence of Baldwin. When Woolley made the proposition to Baldwin which was finally accepted, Baldwin, according to his testimony, was struck with the "monumental greed" of Woolley. This was the frame of Baldwin's mind at the very threshold of the negotiations which resulted

in the transfer of the stock which Baldwin here seeks to set aside. I find it difficult to conceive of the state of mind of one having that confidence which enters into a fiduciary relation in fact with another and at the same time being "shocked with the monumental greed" of the person in whom such confidence is reposed, especially so where the "monumental greed" is directed towards acquiring the property of the confiding person.

Nor do I find any evidence justifying the conclusion that Woolley occupied any position of superiority over Baldwin at the time the agreement in controversy was entered into. Baldwin was in the prime of life. He was educated, and his business experiences were far beyond those of the average man. There is nothing to indicate that he was easily led. Whenever he deemed it to his interests to discharge a director or other officer of his corporations, he did so without any apparent hesitation. When he proposed entering into the sales contract with Ernest R. Woolley, Baldwin's associates, Tanner, Neilson, Hegstead, and Lorin C. Woolley, objected, but Baldwin had his way. Baldwin testified that the directors of the Omega Investment Company never took any action in their official capacity against his desire, except when they passed the resolution directing the dismissal of this suit.

Respondents seem to rely in part upon the professed religious beliefs of Baldwin and Ernest R. Woolley as tending to establish their claim of a fiduciary relation or undue influence. It appears that in one of the first meetings of Baldwin and Ernest R. Woolley in the Hotel Utah Woolley had on his table the standard works of the "Mormon" church, consisting of the Bible, the Book of Mormon, the Doctrine and Covenants, and probably the Pearl of Great Price. Baldwin asked Woolley if he believed in those books, to which Woolley replied that he did. It further appears that Woolley showed Baldwin a check written out to the "Mormon" church for $125,000, and stated that he intended, when able, to turn the check in for tithing to be used in buying land in Jackson

county, Mo., and in financing an expedition to develop true archaeological facts concerning the Book of Mormon. It is further made to appear that Baldwin professed belief in some of the doctrines of the "Mormon" church, but apparently not in the doctrines of that church as now taught. In Baldwin's efforts to put the "Mormon" church right, he was dropped from membership in that church. It is further made to appear that, prior to the time Ernest Woolley became interested in the Incorporated, the meetings of its board of directors were opened with prayer, but, when Woolley became interested in the Incorporated, the prayers ceased, because, as some of the witnesses testified, Woolley informed the directors that he did not mix religion with business. There is nothing in the record to show that either Baldwin or Woolley was insincere in his professed religious views. I do not apprehend it will be seriously contended that we are here called upon to fix the religious status of either Woolley or Baldwin, nor to decide the merits of the religious doctrines which divide Baldwin and the "Mormon" church. Baldwin does not claim that Woolley's professed religious views influenced him in entering into any contract with Woolley.

It is further contended that the fact that Baldwin settled the action of the Incorporated against the Baldwin Radio Company without consulting his attorneys of record is indicative of Woolley's commanding influence over Baldwin. In those negotiations Baldwin had his regularly employed attorney, H. S. Tanner, who has been engaged in the practice of law in this state for a period of 25 years. The settlement secured was $12,500 less than the one theretofore proposed by Baldwin's attorneys of record. Baldwin does not claim that Woolley ever urged him to enter into the settlement. We are as justified in assuming that Ernest R. Woolley opposed the settlement as we are in assuming that Woolley recommended the settlement. A finding either way would be mere conjecture.

Even though it be conceded that a fiduciary relation existed between Ernest R. Woolley and Baldwin, there still

remains to be determined the question of whether or not the transfer of the stock here involved may be voided by Baldwin. The existence of a fiduciary relation does not of itself forbid transactions between persons occupying such a relation. When the fiduciary relation is established, the one in whom confidence is reposed and who claims the benefit of a contract must show that the transaction was openly and fairly conducted and without any concealment or deception. It is contended by respondents that the stock transferred to Woolley is voidable, because Woolley, as the fiduciary of Baldwin, failed in these particulars: (1) Woolley failed to make a full and fair disclosure; (2) the consideration paid by Woolley for the stock was inadequate; (3) that Baldwin did not receive independent advice before transferring the stock. Such is the view taken in the prevailing opinion. Counsel for respondents argue at some length that Ernest R. Woolley was guilty of constructive, if not actual, fraud upon Baldwin, in that Woolley failed to disclose to Baldwin the fact that one Hudson and others owned about 80 per cent of the stock of the Nathaniel Baldwin Sales Company of Delaware. The respondents allege, and the trial court found, that the Nathaniel Baldwin Sales Company of Delaware "is a one-man corporation under the domination and control of Ernest R. Woolley." Respondents do not assign this finding as error, but, on the contrary, argue at length elsewhere in their brief that "the conclusion is inevitable and irresistible to the mind of every clear thinking man who reads this record * * * that the only real party defendant is Ernest R. Woolley." It being established as a fact that Ernest R. Woolley was, at all times involved in this proceeding, merely doing business under the name of the Nathaniel Baldwin Sales Company, it is difficult to understand upon what theory he was under any obligation to inform Baldwin that such was not the fact. Beginning with the execution of the sales contract, Baldwin knew that Woolley was entering into contracts under the name of the Nathaniel Baldwin Sales Company just as Woolley knew that

Baldwin was entering into contracts under the name of the Incorporated. One of the certificates of stock here involved was signed by Baldwin, and was made out to Ernest R. Woolley and the Nathaniel Baldwin Sales Company of Delaware. Baldwin makes no claim to the contrary.

It is also suggested in the prevailing opinion that Woolley may have had information of the value of the Incorporated on December 27th that Baldwin did not have. The record is clear that, if any living person was in a position to know the value of the assets of the Incorporated, that person was Baldwin. The business had been built up by him. He had controlled and directed both the manufacture and the sale of the output of the business from its beginning. From the latter part of November to a few days before the stock transfer was made Woolley had been in the East, while Baldwin remained here, and was in constant touch with the officers of the receiver corporation. Certainly it would have been a useless ceremony for Woolley, if he could, to have informed Baldwin of the financial condition of the Incorporated. There is no suggestion of any other fact that Woolley could or should have disclosed to Baldwin. Baldwin does not claim that Ernest R. Woolley ever spoke disparagingly of the business of the Incorporated. On the contrary, Baldwin testified that Ernest R. Woolley often spoke of its great possibilities.

It is further contended that, in the transfer of the stock, Baldwin parted with valuable property without receiving any substantial value therefor. "Whether a consideration is inadequate or not depends upon the facts as they existed at the time of the transaction and not upon facts as they develop thereafter." 1 Page, Law of Contracts, § 640, p. 1113, and cases cited in the footnote. A transfer of stock is not rendered void or voidable merely because the stock enhances in value after the transfer is made. At the time the stock involved in this proceeding was transferred, Nathaniel Baldwin had been engaged in the manufacture and sale of telephone receivers, head sets, and radio equipment for a period

of at least 10 years. On October 8, 1924, when the receiver was appointed, all of the assets of the Incorporated, exclusive of patents, and including the manufactured products in Chicago, amounted to between $358,279.07 and $378,279.-07, according to the testimony of Dyer. Baldwin placed the total assets, exclusive of patents, at $520,000. The claims against the Incorporated amounted to $747,113.99. Of these claims $233,761.58 was not allowed by the receiver, but it is not otherwise made to appear that the rejected claims were unenforceable. An additional $50,000 of claims was doubtful. While the record does not disclose the grounds upon which the receiver was appointed, the record before us clearly justifies the conclusion that the Incorporated was insolvent at the time of such appointment. The only competent evidence in this record as to the value of the patents belonging to the Incorporated is based upon the earning power of the patents. Upon this basis the patents may well be said to have been of little or no value at the time of the appointment of the receiver. At least one of the two patents had been owned by Baldwin since he began business. The Incorporated owned both patents from its organization. For several months before the receiver was appointed the financial difficulties of the Incorporated increased. In spite of what Baldwin, Tanner, and Ernest R. Woolley did to secure money, a satisfactory loan could not be secured on the property of the Incorporated. Neither the earning power nor the intrinsic value of the patents appears to have assisted in relieving the situation. When we consider the usual course of corporations when their assets are placed in the hands of a receiver, it would seem very improbable that Baldwin would realize anything out of the assets of the Incorporated. Unless some one rendered assistance, all of the assets of the Incorporated would likely be consumed in paying creditors and the costs of the receivership proceedings. That such was the fear and belief of Baldwin both when the receiver was appointed and when the stock was transferred is not open to serious doubt. It is clear that his

associates honestly shared Baldwin's fear and belief. The stock of the Incorporated was apparently without any market value. If Woolley had devoted his time and energy to the refinancing of the Incorporated, and especially if he had revived the Incorporated, and "put it over big," it could not well be said that he would not have paid an ample consideration for the majority of its outstanding capital stock. But it is said that Woolley did not do this. Conceding that Woolley breached his contract, obviously such fact does not support the finding of the trial court that the transfer of the stock was obtained by the fraud and undue influence of Ernest R. Woolley, H. S. Tanner, John T. Clark, Lorin C. Woolley, and Clyde Nielson. The fact that Woolley may have breached the contract of December 27, 1924, has no probative value in this proceeding, except possibly as it may tend to explain the facts as they existed at the time the contract was entered into. This proceeding is in no sense a suit in equity for the rescission of a valid contract. Neither the pleadings nor the findings proceed upon the theory that Baldwin had a right to rescind the contracts entered into with Woolley because of a breach. This suit is based squarely upon the claim that neither Baldwin nor the Omega Investment Company were ever bound by the transfer of the stock in controversy. It is elementary that there is a fundamental difference between the right to avoid a voidable contract because of fraud and undue influence and the right to rescind a valid contract because of a breach. Baldwin may or may not have a right to rescind the agreement whereby Woolley secured 465,701 shares of the capital stock of the Incorporated. That issue is not raised by the pleadings in this case; and hence is not before us for determination.

The view is expressed in the prevailing opinion that Baldwin should have received independent advice before entering into the agreement with Woolley for the transfer of the stock involved in this suit. If there were any one in a position to give Baldwin valuable and independent advice, it was Tanner, Clark, and Nielson. These men were, and had been

Baldwin's trusted employees and advisers. They were familiar with the condition of the Incorporated, some of them because of years of association with Baldwin in attempting to build up the business. From all that appears, Baldwin's interests were their interests. Courts assume that people act honorably, unless the contrary is made to appear. Certain it is that the finding that Lorin C. Woolley acted in collusion with Ernest R. Woolley to defraud Baldwin is without support in the evidence. Lorin C. Woolley left Utah for Chicago on election day in November, 1924, and remained in Chicago until about 2 weeks after the stock was tranferred. Apparently he did not, and could not, know anything about the deal between Woolley and Baldwin until upon his return from Chicago. The good faith of Tanner, Clark, and Nielson cannot be impeached by the mere fact that subsequent events showed that they were mistaken. Baldwin's judgment in this respect was as fallible as that of his associates. After the appointment of the receiver, Baldwin was in frequent communication with the officers of the receiver corporation, and certainly had a better opportunity to know the financial condition of the Incorporated than did any of the impleaded defendants or Ernest R. Woolley.

Nor can I find any merit to the claim that Clark, Nielson, or Tanner had any monetary interest in the stock transferred to them on December 27, 1924. The placing of the stock in their names followed the same practice that Baldwin had followed since the organization of his corporations. The certificate of stock made out to Delbert Osguthorpe was indorsed and delivered to Baldwin just as the other stock was delivered to Woolley.

It is further suggested that the action of H. S. Tanner, Lorin C. Woolley, Clyde Nielson, and Daniel R. Bateman in passing the resolution directing the dismissal, with prejudice, of the suit of the Omega Investment Company against Woolley, tends to show that the directors of the Omega Investment Company were in collusion with Woolley in Decem-

ber, 1924. The complaint filed in this suit reflects upon the honesty and integrity of Tanner, Nielson, and Clark, who participated as directors of the Omega Investment Company. If Tanner, Clark, and Nielson are to be believed in their versions of the transaction had between Baldwin and Ernest R. Woolley, it is quite natural that they should protect themselves against the claim of Baldwin, and especially so, where, as here, Baldwin began this suit without any intimation to them that he was dissatisfied with the arrangements with Woolley.

After a careful consideration of the evidence in this case, I am forced to the conclusion that Baldwin is not entitled to have the transfer of the stock to Ernest R. Woolley, H. S. Tanner, Lorin C. Woolley, John T. Clark, and Clyde Nielson vacated and set aside on the record now before us. The fact that Ernest R. Woolley may not have kept his promises to, or agreement with, Baldwin at times prior to the transfer of the stock in question is not a sufficient reason to relieve Baldwin from his contractual obligations. When the stock was transferred, Baldwin knew what Woolley had done and failed to do prior to that time as well as he knew those facts when he began this suit. The mere fact that Woolley may have breached the contract of December 27, 1924, does not justify the conclusion that the transfer of the stock was either void or voidable. When Baldwin transferred the stock in question, he received all that he contracted to receive, namely, the cancellation of the sales contract and the promises of Woolley. Be the consideration received by Baldwin much, little, or nothing, he cannot have the transfer vacated upon the ground that he received no consideration for the transfer. I am unable to find any evidence whatsoever in the record showing that Ernest R. Woolley made any false representations to Baldwin that induced Baldwin to transfer the stock. If there is any fact that Woolley could or should have revealed to Baldwin at the time of the stock transfer, it is not shown or suggested by the record before us. I am unable to find any justification in the evidence to support

the conclusion that either Tanner, Clark, Nielson, or Lorin C. Woolley acted otherwise than in good faith in the transaction. It is clear from Baldwin's own testimony that he did not question the sincerity of his former associates until more than 3 months after the stock was transferred. In the meantime, Baldwin had become friendly towards the officers of the receiver corporation, and it is quite apparent that he learned that something would probably be saved out of the assets of the Incorporated. He then realized that he had made a poor deal, and began to cast about for a way out of his contract, and this proceeding is the result. Baldwin is not entitled to have his contracts set aside upon his claim that he was "like a tumble weed in a wind," when, as here, he entered into the arrangement with Woolley after 3 or 4 days of consultation and deliberation. To me it is obvious that Baldwin is here seeking to have the stock transfer set aside, not because of any fraud or undue influence practiced upon him, but because of the fact that the stock unexpectedly became valuable under the management of the Incorporated by the receiver.

I am of the opinion that the judgment should be reversed.

### On Petition for Rehearing.

BATES, District Judge. The appellants have petitioned for a rehearing. Their complaint is that the court has erred in finding that a fiduciary relation existed between appellant Ernest R. Woolley and respondent Nathaniel Baldwin and in placing the burden of proof upon the appellants to show that the transaction was fair and equitable, and that the price paid for the transfer of the stock was adequate.

In February, 1924, Woolley was employed to settle the Baldwin-Radio suit, and effected an agreement of settlement over the heads of, and without the knowledge of, the regular and able counsel in the case September 16, 1924. The action

was finally dismissed just prior to the stock transfer which is the subject of this action.

The instrument known as the "infringement contract" was executed September 24, 1924. This instrument designated Woolley agent of Baldwin and the Baldwin Incorporated, with power to make demands, adjustments, and settlements, and to prosecute suits upon and in respect to claims for damages arising out of all past, present, and future infringements of patents, with full and complete control, management, and discretion as to such demands, adjustments, settlements, and prosecution of suits. The relation of agency created by this instrument continued up to and including the time the stock transaction was accomplished.

The following uncontradicted excerpts from the record show Baldwin's complete confidence in, and his reliance and dependence upon, Mr. Woolley; that Mr. Woolley understood and appreciated the confidence and trust so reposed in him; and that he assumed the resulting position of superiority cannot be doubted:

"I saw him once or twice in the meantime, then about August 1 I commenced to see him very frequently, more so than ever. I saw him in his offices in the Judge building usually pursuant to invitation. I used to see him almost every day until the settlement of the matter. Our troubles were becoming more difficult all the time and I looked to him to help us out of our difficulties, particularly in the way of raising finances for us.

"He used to inquire of some things but usually he would tell me things about the condition of the business; would tell me the affairs of the company, about how many phones they were selling and what the demand for them. He knew more about it than I did and he used to tell me rather than for me to tell him. From time to time he gave me advice, he was always giving me advice and instructions, but I am puzzled about the details. I relied upon Ernest Woolley as an adviser and an adjuster of our business difficulties. He seemed to know more about the business than I did if what he told me was true. He seemed to know how many had been sold and who were the purchasers. He knew the infringers that were infringing our business. I used to listen with great interest to hear him tell about the things

he knew. He seemed to have connections or sources of information at home and abroad where he could find out the details of the business. I learned to look upon him as a master mind that could comprehend great things easily, take them all in and understand them. A master mind in matters of business and law. My confidence in Ernest Woolley as master in these matters and also as a good man continued until some time in the spring of 1925 and then doubts began to creep in because of things that happened and my confidence in him as an honest man failed. * * *"

"In reference to the assistance in the matter of detail and matters of business Ernest Woolley was my chief adviser. I think it was in August when John T. Clark became the adviser pertaining to Ernest Woolley. Before that it was Lorin Woolley wanting me to see Ernest Woolley and engage his attention in the settling of this suit, but as to the contracts with Ernest Woolley those contracts were entered into particularly upon the advice of John T. Clark and others, but he was the principal adviser. The frequent meetings with Ernest Woolley and advice relative to the infringements and pending litigation continued from August through the rest of the year 1924, and I relied upon it."

"* * * He (Mr. Tanner) was our legal adviser but on account of the confidence that was inspired in me by Ernest Woolley, John T. Clark and Lorin Woolley, I regarded Ernest as our guide in preference to Mr. Tanner in cases where there was a difference. Where Mr. Tanner advised one thing and Mr. Woolley advised another the advice of Mr. Woolley was taken instead of Mr. Tanner."

"When this transaction was made I was amidst the influences of men whom I trusted, whom I thought were honorable, whom I thought were my friends, whom I thought were protecting the business, whom I thought were interested in the business along with me and in the same manner that I was and I regarded their opinion and feeling in regard to these matters as of equal value with mine. And I have expressed myself as if I were in a whirlwind at the time, carried along by the influence of others and I was also in a state of much anxiety, fear and confusion because of the many reports which they made from time to time regarding the actions of people of Salt Lake City."

Lorin C. Woolley, in speaking of his and Ernest Woolley's trip to Chicago in November, 1924, testified as follows:

"Ernest and Mr. Tanner were trying to advise us with reference to the company's difficulties, both of them. We were all working to-

gether, Ernest included, trying to lift the company out of its difficulties. He was giving us advice on the matter and continued to do so up until the time I left for Chicago. I went on election day and before I went I made complaint that on my previous trip my hands were tied. That statement was made in Ernest Woolley's office. I don't think Ernest advised Baldwin to let me have freedom in going back there. I think Tanner was the man to recommend him to do it. I think he said I should go back there with a free hand. I think Ernest Woolley was present. I don't think Ernest objected to it. Ernest Woolley was not a director, if I remember aright he was an adviser. While I was in Chicago I communicated with Baldwin quite frequently. The correspondence was directed to the company at Ernest Woolley's office. That is where I was told to send it, by Baldwin I think. I saw Ernest back in Chicago. I think it was along in December. The first place I saw him was at the Congress Hotel. He notified me after he got there and I went over to see him. I think I likely advised with Ernest about the Incorporated business and told him what the conditions were. I think likely he gave me his idea of what to do. We were not working to antagonistic purposes at that time, both working for the interests of the Incorporated. We would co-operate together and give each other our ideas as to what ought to be done for the future. I saw him nearly every day for a week or ten days. He left Chicago so as to be back here a day or two before Christmas."

"I knew that Ernest Woolley was conferring with Baldwin from day to day. He came in quite often. Possibly I came sometimes with him. I think Woolley and Baldwin conferred with reference to the difficulities of the Incorporated. That was generally talked over with a director. That was the foremost matter, the difficulty he was in and how to get out of it. I don't know how much Ernest Woolley was trying to help. I thought he was there to help. Of course, I did not know what they were doing. I saw him there. He was apparently trying to help Baldwin. Generally seemed to be so far as I could see about it. All working to that end so far as I observed."

The foregoing quotations from the abstract of the testimony are suggestive, but by no means exhaustive, of the mass of evidence offered tending to show the close and confidential relation existing between these parties at and prior to the date of the stock transfer. The same evidence also makes it clear that Baldwin, having exhausted his own resources, was entirely in the hands of, and dependent upon,

Woolley; that he was in a state of mind which made it impossible for him to exercise an intelligent judgment; and that he was as clay in the potter's hands.

The record clearly establishes, as is pointed out in the prevailing opinion, that, from the time these men became acquainted, Woolley manifested an unusual interest in the manufacturing enterprise Baldwin had established. Woolley's office became, and continued to be, the center in which all discussions relative to the Baldwin interests were carried on, and from which all the business relative to the solution of the difficulties of the Incorporated was conducted. Woolley became and continued as Baldwin's agent to settle important litigation then pending, to protect the patent rights upon which the entire enterprise depended from infringements, and to bring suits, make demands, adjustments, and settlements upon all infringement claims past, present, or future. He entered into contracts with Baldwin intended to make him the exclusive selling agency of all the products of the entire manufacturing plant. Baldwin looked to him for, and he gave, advice relative to all matters of detail. Baldwin accepted his judgment upon legal and business matters in preference to the regular counsel. Woolley, after the receiver had taken charge of the plant and its products because of a failure to live up to his agreements, then proffered to aid in securing funds to take the business out of the hands of the receiver. After unsuccessful efforts at home, he went for that purpose to Chicago. While there, he and Lorin C. Woolley, who was also there on Baldwin's business, consulted constantly with reference to the Incorporated's business, both co-operating and giving each other ideas as to what ought to be done. Woolley returned home just prior to Christmas, and reported to the directors that he had raised $250,000 to take up the warehouse receipts. He immediately thereafter told Baldwin that he was not able to have the proper influence with people he had to deal with, regretted that he was unable to speak with authority, and said that, if he could have an equal interest and be vice president, he could

speak with authority, accomplish things, say "yes" or "no" instead of having to be a go-between as he had been before. Woolley took an active part in all negotiations and transactions pertaining to the Baldwin business from the time of his acquaintance with Baldwin. He cultivated Baldwin's confidence, and knew that Baldwin relied upon him, trusted to his judgment, and believed in his integrity. Knowing these things, he assumed to act as Baldwin's adviser in legal and business matters and as his agent in the efforts that were being made to get the property out of the hands of the receiver.

These facts, together with numerous other conditions referred to in the prevailing opinion, certainly establish a most trusting confidence and reliance reposed in Woolley by Baldwin, Woolley's knowledge of such confidence and reliance, and a resulting superiority and influence acquired by Woolley over Baldwin that are characteristic of and created a fiduciary relationship.

Appellants insist that a fiduciary relation is not shown by proof of mere confidence, but it must be shown that the one person occupied a position of commanding superiority over the other. The rule so stated is fully satisfied by the facts in this case. Confidence was reposed, and should have been preserved from imposition. Influence was acquired, and should have been kept free from the taint of selfish interests and overreaching bargains.

Appellants also rely on the rule that, if a transaction concerns a subject-matter which is outside of, and unconnected with, the agency, no presumption of undue influence arises. The rule can have no application in this case. As already explained, the stock transfer was the culmination of a series of transactions between these parties. They are not separate or distinct. Each link in the chain of circumstances is suggestive of a plan to overreach Baldwin through a confidence carefully nurtured and preserved. The underlying purpose of all the transactions between Baldwin and Wool-

ley, the subject of all their discussions, was to save the Baldwin enterprise and get it out of the hands of the receiver. For this purpose Woolley finally went to Chicago to raise the quarter of a million he reported to the directors to be in the bank. For the same apparent purpose Woolley, upon his return, stated to Baldwin that he was not able to have the proper influence with people he had to deal with, that he was unable to speak with authority, that, if he could have an equal interest and be vice president, he could speak with authority, say "yes" or "no" instead of being a go-between, and accomplish things. And it was for the same underlying purpose that the stock was transferred by Baldwin to Woolley. It will not do, under such conditions, to say that the stock transfer was not connected with, and aided by, the confidence and resulting superiority between these parties.

Other points are argued in support of appellants' motion for a rehearing, but they are all dependent upon the existence of a fiduciary relation. We are fully convinced, after a careful reading of appellants' argument, that a fiduciary relation existed between these parties, and that the burden of showing good faith, full disclosure, and adequacy of consideration was properly cast upon appellants; that appellants signally failed to sustain that burden; that the conclusion of the prevailing opinion that the judgment should be affirmed is right; and that the petition for a rehearing should be denied.

It is so ordered.

THURMAN, C. J., and CHERRY and GIDEON, JJ., concur.

HANSEN, J. I am of opinion a rehearing should be granted.